AO 106 (Rev. 04/10) Application for a Search Warrant                    AUTHORIZED AND APPROVED/DATE: ___ EMJ 1/29/2024

# UNITED STATES DISTRICT COURT
### for the
Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>15716 Potomac Drive, Edmond, Oklahoma 73013-0026 WITH<br>ACCESS AND CONTROL OF THE ATTACHED GARAGE,<br>ALL OUTBUILDINGS, VEHICLES, AND CURTILAGE | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. MJ-24-74-STE |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A," which is attached and incorporated by reference herein.

located in the _____Western_____ District of _____Oklahoma_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B," which is attached and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. s. 2422(b) | Coercion and Enticement of a Minor |

The application is based on these facts:

See attached Affidavit of FBI Special Agent Shana Terry, which is incorporated by reference herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shana Terry, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **Jan 31, 2024**

*Judge's signature*

City and state: Oklahoma City, Oklahoma

SHON T. ERWIN, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Shana Marie Terry, a Special Agent with the Federal Bureau of Investigation ("FBI"), Oklahoma City, Oklahoma, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been employed as a Special Agent with the FBI since February 2019 and have been assigned to the Oklahoma City Division of the FBI for the entirety of that time.  I am currently assigned to the Norman Resident Agency.  During my time as a Special Agent, I have conducted a wide variety of investigations, including numerous cases involving child pornography and sexual exploitation of children.

2.      As a Special Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3.      The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and review of documents and records.  This Affidavit is made in support of an application for a warrant to search the entire premises located at **15716 Potomac Drive, Edmond, Oklahoma 73013** (hereinafter referred to as the "**SUBJECT PREMISES**"), which is described in detail in Attachment A to this Affidavit, including the residential dwelling, vehicles, curtilage, any persons located on said property, and any computer (as broadly defined in 18 U.S.C. § 1030(e)(1)) or other digital file storage device located there, for the items specified in Attachment B hereto, which constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. § 2422(b), coercion and enticement of a minor.

4.      This investigation, described more fully below, has established probable cause to believe that **SAI KUMAR KURREMULA ("KURREMULA")**, date of birth xx/xx/1993,

knowingly utilized the Snapchat mobile application from the **SUBJECT PREMISES**, to coerce and entice a minor, in violation of 18 U.S.C. § 2422(b), and that there is probable cause to believe that evidence, fruits, and instrumentalities of such violations are located at the **SUBJECT PREMISES**.

5.      Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711 and 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

## TERMS

7.      Based on my training and experience, I use the following technical terms and definitions:

a.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where (1) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor-engaged in sexually explicit conduct, or (c) the

2

visual depiction has been created, adapted or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

b.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

c.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

d.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

e.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

f.    "Computer," as used broadly herein, refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones. *See* 18 U.S.C. § 1030(e)(1).

3

g.     An "Internet Protocol" ("IP") address is a unique numeric address used by computers on the internet. An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static, or long-term, IP addresses. Other computers have dynamic, or frequently changing, IP addresses.

h.     "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing device (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

i.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data

security hardware may include encryption devices, chips, and circuit boards. Data security software may include programing code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

    j.  The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    k.  "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

    l.  "Mobile applications" or "chat applications," as used herein, are small, specialized programs downloaded onto mobile devices, computers, and other digital devices that enable users to perform a variety of functions, including engaging in online chat and sending or receiving images and videos.

    m.  "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a form that resembles an oral conversation. This further distinguishes chatting from other text-based online communication such as Internet forums and e-mail.

n.    "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones. SMS is also often referred to as texting, sending text messages, or text messaging. The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone.

o.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

## BACKGROUND ON SNAPCHAT

8.    Snapchat is a free mobile application made by Snap, Inc. and is available for download through the Apple App Store and Google Play Store. The Snapchat application is used to share information through photos, videos, and chat messages, as well as to enable voice and video calls.

9.    To use Snapchat, a user must download the mobile application to their mobile device and sign up by providing a name and date of birth. The user then selects a username and password. Snapchat then requires an e-mail address or phone number to create an account. A user can also create a display name.

10.    A Snapchat username is a unique identifier associated with a specific Snapchat account, and it can only be changed once a year. A display name is how a user appears on Snapchat and can be changed at any time.

11.    "Snaps" are photos or videos taken using the camera on an individual's mobile device through the Snapchat application, and they may be shared directly with the user's friends, in a Story (explained further below), or in a Chat.

6

12.    A user can type messages, send Snaps, audio notes, and video notes to friends within the Snapchat application using the "Chat" feature. Snapchat's servers are designed to automatically delete one-on-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen, depending on the user's "Chat" settings.

13.    An "emoji" is a small digital image or icon used to express an idea or emotion. Snapchat automatically assigns "Friend Emojis" to a user's friends on Snapchat based on the way a user and their friends use Snapchat.

14.    A "bitmoji" is a small digital cartoon image that a Snapchat user can personalize to look like or represent themself. A Snapchat user can link a previously created bitmoji to their Snapchat account or create a new bitmoji through the Snapchat application. A Snapchat user's bitmoji accompanies their name in multiple facets of the application, including Chats and Snap Map.

15.    Basic subscriber information is collected when a user creates a new Snapchat account, alters information at a later date, or otherwise interacts with the Snapchat application. The basic subscriber information entered by a user in creating an account is maintained as long as the user has not edited the information or removed the information from the account.

16.    In addition to the information provided by a user to register an account, Snap, Inc. may retain the account creation date and Internet Protocol ("IP") address. Snap, Inc. also stores the timestamp and IP address of an account user's logins and logouts.

17.    For each Snapchat user, Snap, Inc. collects and retains the content and other records described above.

18.    Snap, Inc. retains logs for the last 31 days of Snaps sent and received, for 24 hours of posted Stories, and for any unopened Chats or those saved by the sender or recipient.

The logs contain meta-data about the Snaps, Chats, and other activities, but not the content. Snap, Inc. may be able to retrieve content of some Snaps.

19.     Videos and photos sent and received as Snaps are accessible to users for only a short period of time. If a screenshot is taken of an image by the recipient, the sender is notified. Videos cannot be saved by the recipient. Because of the common belief by Snapchat users that videos and photos cannot be retained by recipients, Snapchat is often used to facilitate and document criminal acts.

### PROBABLE CAUSE

#### *R.W. and Katie Anderson*

20.     On October 25, 2023, R.W., a fourteen-year-old female, was forensically interviewed at the FBI's Lawton Resident Agency after being identified as a potential victim of sexual exploitation by an FBI subject living outside the United States. During the interview, R.W. revealed that, in addition to the overseas subject, she had also been contacted by a Snapchat user approximately two years ago, utilizing the Snapchat account "k_anderson21278," with display name Katie Anderson ("Anderson"). R.W. provided information about her interactions with Anderson during the forensic interview, but due to the poor audio quality of the recording, she also provided clarifying information during a second forensic interview on November 21, 2023.

21.     R.W. was contacted by Anderson through Snapchat approximately two years prior to the forensic interview. Through R.W.'s initial communications with Anderson, she told him she was twelve years old. Anderson admitted to R.W. that his name on Snapchat was fake but would not reveal his real name. Initially, the conversation between R.W. and Anderson was routine, but then Anderson began asking her to take nude photographs of herself and send them

to him via Snapchat. Anderson then began pressuring R.W. to participate in sexually explicit video calls with him via Snapchat. R.W. began crying during the interview when asked to describe the video calls with Anderson. R.W. estimated Anderson pressured her to participate in a video call with him approximately once a week over the time period of approximately one year. Every video call would last approximately ten to fifteen minutes and included Anderson making R.W. remove her clothes from the waist up, and on one occasion, he made her show her genitals as well and instructed her to touch herself. Sometimes, R.W. cried during the calls because she did not like doing them, and Anderson would tell her, "Don't cry" and acted as if he cared.

22.    Anderson never showed his face on the video calls and refused to provide R.W. with any real information about himself. Anderson would say only that he lived in Oklahoma City, despite R.W.'s attempts to obtain his address. R.W. believed Anderson lived with roommates because he sometimes ended calls with her by saying his roommates were home.

23.    R.W. recalled a time when she argued with Anderson because she did not want to participate in a video call with him. Anderson sent her a video he had previously recorded of her and threatened to come to her house and show it to her parents if she did not do a video call with him. The recording showed a previous video call between R.W. and Anderson, which Anderson had recorded with a different phone. In the call, R.W. was nude above the waist.

24.    Out of fear, R.W. continued participating in video calls with Anderson. Any time she tried to refuse, Anderson used the threat of showing the sexually explicit video to her parents. On one occasion, Anderson even sent her a picture of himself driving and stated, "I'm coming."

9

25.    On one occasion, R.W. was arguing with Anderson about having a video call, and Anderson stated, "I have other girls."    R.W. did not know anything about the other girls Anderson referenced.

26.    In the summer of 2023, Anderson wanted to meet R.W. in person and threatened to show her parents the video if she did not agree to it.    Anderson told R.W. he wanted her to touch his penis with her hands.    When he arrived, R.W. did not want Anderson to pull into the driveway of her home, so she told him to park down the street in front of the housing community's office building.    In the back seat of Anderson's car, Anderson began touching R.W.'s chest and kissing her.    He took off her shirt, pants, underwear, and bra.    He touched her vagina with his hand and then penetrated her vagina with his penis.    Anderson also forced R.W. to perform oral sex on him.    R.W. cried as these things were happening, but she did not think Anderson noticed.    R.W. recalled that Anderson used a condom when he had sex with her.

27.    R.W. and Anderson met in person again two or three weeks later.    They met at the same location, and Anderson did the same things to her.    Although this time, Anderson brought energy drinks with him and made R.W. drink them.    R.W. recalled they said "Monster" on them, and they tasted "gross."    Anderson said they would give her energy.

28.    R.W. recalled the first time she met Anderson in person, he drove a large black car, and the second time he drove a white vehicle with a round top, possibly an SUV.    She noticed both vehicles had "window covers" that could be pulled down over the windows.

29.    R.W. described Anderson as having dark skin and black hair, with "bushy" eyebrows.    He was Indian (from the country of India) and spoke with a thick accent.    He possibly

had short facial hair around his chin and up toward his ears.[1] R.W. stated that she blocked Anderson in October 2023.

30. A query of Snapchat username "k_anderson21278" in FBI databases revealed an anonymous complaint reported to the FBI on October 1, 2022 via the National Threat Operations Center. The anonymous complainant claimed to be thirteen years old and reported on an adult male using the Snapchat account "k_anderson21278." The complainant stated, "[t]his adult male has revealing photos of me and is threading (sp) me that if I don't do a revealing video call he will come to my house." The only contact information the complainant provided was an e-mail address. An FBI Special Agent made numerous attempts to contact the complainant via the provided e-mail address in order to further substantiate the allegations, but no response was received.

31. R.W.'s parents provided the FBI consent to search R.W.'s phone, an iPhone 14. Contents of the iPhone 14 were extracted and made available for review via Cellebrite, a cell phone extraction program widely used by law enforcement to extract and organize the contents of seized cell phones. The phone extraction listed two Apple IDs associated with the phone, one of which was the same as the e-mail address provided by the anonymous complainant described in the previous paragraph, identifying R.W. as being the complainant.

32. Although the iPhone 14 did not contain the contents of communications between R.W. and Anderson, it did acknowledge the existence of communication between them. The

---

[1] It should be noted that FBI Special Agent Nathan Wilkins, who observed the first forensic interview of R.W., documented Anderson's race as being white. Special Agent Wilkins later realized he had inadvertently added the detail to the report because of his prior conversation with R.W.'s parents, who thought R.W. told them Anderson was a white male. This detail was clarified with R.W. in her second forensic interview, where she stated Anderson was Indian.

iPhone 14 documented a Chat between R.W.'s Snapchat account and Snapchat user "k_anderson21278," beginning on March 9, 2023 and ending on September 25, 2023. In addition, Katie Anderson is listed in the Contacts of the iPhone 14. InteractionC recorded 969 incoming interactions from the contact.[2]

33.    A screenshot was located on the iPhone 14 depicting the Snapchat Chat page. The screenshot is pictured on the following page:



_____

[2] According to the glossary on Cellebrite's website, www.cellebrite.com, InteractionC is a database, common to Apple devices, that tracks interactions, such as text messages of the user, with recent contacts.

34.    Snapchat user Katie Anderson is listed on the Chat page, with a smiling face emoji pinned to the bitmoji, which, according to Snapchat's support page, help.snapchat.com, indicates the user is one of your "Best Friends." Snapchat uses an algorithm to determine a user's "Best Friends," which takes into consideration the number of Snaps sent to each other, how many days in a row the users have communicated with each other, as well as other factors. When a user is one of your "Best Friends," it indicates you send a lot of Snaps to the user, but they are not your "#1 Best Friend."

35.    According to Snapchat's support page, the empty blue arrow pictured next to Anderson's bitmoji indicates Anderson opened a Chat.

***K.M. and Katie Anderson***

36.    On November 8, 2023, a federal Search and Seizure Warrant was served to Snap Inc. for information related to Snapchat account "k_anderson21278." A review of the provided records showed there were no saved communications between Anderson's account and R.W.'s account. However, numerous Chat messages were provided between Anderson's account and an account later identified as belonging to a different individual, K.M. The messages involve sexually explicit conversations and span the short time period between December 8, 2022 and December 14, 2022. In the messages, Anderson asks K.M to show him her "ass" and "titties." When K.M. says she is not in a private location, Anderson asks if she has any saved photographs of her or her friends. From context, it appears that some of the messages are sent during the course of video calls between Anderson and K.M. Anderson instructs K.M. what he wants to see her do during the calls, such as "Lemme see the ass," and "Move back babe, Can't see the full tits." Anderson also attempts to get K.M. to meet him in person to have sex. However, there is nothing in the chat to suggest they did meet in person. The messages do not provide any

13

identifying information about either user, except when K.M. asked what Anderson looked like, he referred to himself as "black."[3]

37.     Utilizing subscriber information related to K.M.'s Snapchat account, K.M. was identified and a forensic interview was conducted with her on January 11, 2024.  During the interview, K.M. recalled a man initiating contact with her via the Snapchat application.  A series of Chat messages (previously referred to in paragraph 36) was shown to K.M. during the interview, and she confirmed it was her account listed in the communications and that she had been participating in the conversations.  K.M. was thirteen years old at the time of the messages.  K.M. explained that the conversation with "k_anderson21278" began in a routine way, but then he started asking her to send him sexually explicit photographs and videos of herself.  K.M. could vividly recall that, when she refused to send him what he wanted, he told her that if she did not send what he was asking for, he would "shoot up" her family.  Anderson deleted the threatening message shortly after sending it.  K.M. believed Anderson would follow through with his threat, and out of fear, she continued to send him the photographs and videos he wanted, to include sexually explicit images of her breasts and genitals.  Anderson instructed K.M. to play with herself in the videos and made her call him "daddy."

38.     K.M. recalled that periodically, Anderson initiated video calls with her.  If she did not answer the call, he would continue to call her over and over.  K.M. recalled a particular video call where Anderson was in the shower and K.M. noticed he was wearing sandals.  In the video call, the man was playing with his penis with his hand.  K.M. recalled the man making a "come

---

[3] It is also noted that in a Chat dated December 25, 2022, Anderson shared messages with another Snapchat user in which he stated he was from Edmond, Oklahoma.

here" gesture with his hand, indicating he wanted K.M. to join him. Eventually, K.M. stated that something white came out of the man's penis and went down the shower drain.

39.    K.M. recalled Anderson had initially sent her a picture of himself, which showed his skin tone to be white. However, when K.M. saw Anderson in real-time during the video call, she described his skin tone as "really light brown" and recalled that he spoke with an accent.

40.    K.M. believes Anderson used other Snapchat accounts to contact K.M. For example, K.M. recalled having similar communication with a man whose name started with "R". "R" made K.M. send the same type of photographs and videos of her breasts and genitals as the first man.

41.    K.M. believes that the users of one or both of the Snapchat accounts were saving her pictures and videos. She recalled the user of one of the accounts threatening to show up at her house and show her father one of her sexually explicit photographs.

***Corroboration of Kurremula's Connections to the Snapchat Accounts***

42.    On October 26, 2023, an Administrative Subpoena was served to Snap, Inc. requesting subscriber information for Snapchat user "k_anderson21278" for the time period of October 1, 2022 to October 26, 2023. At that time, returned records revealed that the account for "k_anderson21278" was created on December 21, 2021 and was last active on October 26, 2023. Further investigation has revealed activity on the account as recently as November 11, 2023. The IP address used to create Snapchat account "k_anderson21278" on December 21, 2021 was 70.174.239.59.

43.    An Administrative Subpoena served to Cox Communications for subscriber information associated with the IP address during the time period of December 19, 2021 to

December 23, 2021 (targeting the creation date of the "k_anderson21278" account) revealed the following registration information:

- Name: Bhargave Ramulu Pullaboina ("Pullaboina")

- Address: 15716 Potomac Dr., Edmond, OK 73013-0026 (the **SUBJECT PREMISES**)

- Account Status (currently): Disconnected

44.    According to U.S. State Department records, at that time, Bhargave Pullaboina resided in the U.S. on a Temporary Work Visa from India.  Records indicate Pullaboina left the United States on October 14, 2023 and returned on December 16, 2023.

45.    IP address data from Snap Inc. revealed a second IP address as well, and that IP address was linked to activity for the Snapchat account "k_anderson21278" after Pullaboina's departure on October 14, 2023.  It showed that the IP address 70.174.239.84 was the last recorded IP address used by Snapchat account "k_anderson21278" on October 26, 2023 and was connected to over 350 occurrences of account activity during the month of October 2023 and over 3,400 occurrences of account activity from October 20, 2022 to October 26, 2023.

46.    Accordingly, an Administrative Subpoena was served to Cox Communications for subscriber information related to IP address 70.174.239.84 for the timeframe of October 1, 2022 to October 26, 2023.  The following information was provided by Cox Communications:

- Name: **Sai KURREMULA**

- Address: 15716 Potomac Dr., Edmond, OK 73013-0026 (the **SUBJECT PREMISES**)

- Home Phone Number: 405-546-8691

- Account Status: Active

16

47.    The information received from Cox Communications indicated that both IP addresses registered to the **SUBJECT PREMISES** were associated with the same modem, and that, on July 1, 2022, the name on the account changed from Pullaboina to **KURREMULA**. Additionally, utility records reveal that the Oklahoma Gas & Electric ("OG&E") account serving the **SUBJECT PREMISES** was transferred from Pullaboina to **KURREMULA** on July 1, 2022. The water bill was also transferred from Pullaboina to **KURREMULA** on July 15, 2022.

48.    In addition to this information, household listing records, as well as credit bureau reporting, suggest that Pullaboina moved to a different residence in Edmond, Oklahoma around the time the Cox Communications account was changed from Pullaboina's name to **KURREMULA**'s name. According to public records made available by the Oklahoma County Assessor, Pullaboina and his wife purchased a residence located on MacArthur Park Road in Edmond, Oklahoma on June 30, 2022. Oklahoma County Assessor records also indicate that **KURREMULA** currently owns the **SUBJECT PREMISES**, having purchased it on September 18, 2020.

49.    On numerous dates between October 31, 2023 and December 19, 2023, FBI Special Agents drove by the **SUBJECT PREMISES**, and each time, only the following two vehicles were in the driveway:

- White Toyota Prius registered to **KURREMULA**
- Black Audi AQ7 registered to **KURREMULA**

50.    According to U.S. State Department records, **KURREMULA** is currently residing in the U.S. on a Temporary Work Visa from India and has been in the U.S. since September of 2015.

17

51.     Multiple media files were provided by Snap Inc. pursuant to the Search Warrant of the "k_anderson21278" account. A review of the media files revealed that twelve media files were transferred between "k_anderson21278" and Snapchat account "ryan_121312" on December 12, 2022 and December 13, 2022. Eleven of those files are photographs taken of a mobile phone screen showing the breasts of a female wearing a bra. The female's face is not shown. The remaining media file is a photograph showing a male holding his erect penis in his hand. The male's face is not shown.

52.     An Administrative Subpoena was served to Snap Inc. for subscriber information associated with Snapchat account "ryan_121312" for the time period of December 12, 2022 and December 13, 2022. Returned records indicated the account was created on June 23, 2022. IP address data revealed Snapchat activity was conducted with the account on two occasions utilizing IP address 70.174.239.84, which is the same IP address connected to activity on the "k_anderson21278" Snapchat account, resolving back to the **SUBJECT PREMISES**. Further review of the records reveals that both "k_anderson21278" and "ryan_121312" share the same creation IP address, also resolving back to the **SUBJECT PREMISES**.

53.     Shortly after receiving subscriber information related to Snapchat account "ryan_121312," Snap Inc. provided additional information to FBI Liaisons at NCMEC regarding media files which were saved, and/or shared, and/or uploaded to the account and contained child sexual abuse material. On the dates of November 4, 2023 and November 11, 2023, "ryan_121312" saved, and/or shared, and/or uploaded seven media files fitting the characterization of a "Sex Act" involving a "Pubescent Minor" and 22 media files fitting the characterization of "Lascivious Exhibition of a Pubescent Minor."

18

54.    A review of the media files revealed they consisted of 25 images and five videos. All media files appeared to be photographs or videos of a separate mobile phone communicating within the Snapchat application.    Most images and videos depict a female rubbing and manipulating her bare breast(s) with her hand.  The female's face is not shown.

55.    A Federal Search Warrant was served to Snap, Inc. for records related to Snapchat account "ryan_121312."  The most recent IP address used to log into the account was listed as 70.174.239.84, resolving to the **SUBJECT PREMISES**, on December 4, 2023.  The returned records included over 1,700 media files (photographs and videos), many of them related to the user's communication with young females.  The majority of media files consisted of photographs or videos recorded by a separate device, indicating that the user surreptitiously recorded videos calls and chats with the girls.  The media files are consistent with the sextortion scheme described by R.W. and K.M., in that the surreptitious recordings show the user clicking in and out of his chats with numerous girls, in an apparent effort to clearly show which accounts sent the videos.  In addition, screenshots were saved from the Google Maps application that show the location of specific addresses.

56.    It is also apparent from the records that the user of "ryan_121312" falsely represented himself to the girls he communicated with through Snapchat.  Each time he introduced himself to a female, he sent a picture of a young white male to portray himself. According to Chat messages, he routinely represented himself to be a 13- to 15-year old boy, which varied depending upon the ages provided by the girls.

57.    Although most of the surreptitious recordings associated with the "ryan_121312" account were focused solely on the phone being used to communicate with the females, some of the recordings show details of the user's environment and clothes.  For example, part of the

19

user's shorts can be seen in a few of the recordings. In other recordings, elements of the user's location, such as the room or vehicle the user is sitting in, can be seen. Additionally, the lighting in some of the recordings reveal certain unique characteristics of the phones being utilized, such as a crack in the screen.

58.     The media and Chat files associated with account "ryan_121312" also revealed two additional Snapchat accounts that are believed to have been utilized by the same individual: "nickdrrick" and "patrick_funn." Child Sexual Abuse Material ("CSAM"), in the form of surreptitious recordings of young girls, was routinely transferred between the four accounts. In addition, it appears the user sent himself notes to his other accounts. For example, on March 7, 2023, "k_anderson21278" sent "ryan_121312" a message that simply listed an address, followed by "huswife." On March 8, 2023," k_anderson21312" sent 22 photographs and 6 videos containing CSAM, all of which appear to be related to a Snapchat account with Display Name "his Wife." Similarly, notes containing addresses, usernames, and the name of schools, are shared between "ryan_121312," "k_anderson21278," "nickdrrick," and "patrick_funn."

59.     Subpoenas sent to Snap Inc. for subscriber information revealed that Snapchat account "nickdrrick" was created on October 25, 2022, and Snapchat account "patrick_funn" was created on September 12, 2023. Both accounts were created using IP address 70.174.239.84, which resolves back to the **SUBJECT PREMISES** in **KURREMULA**'s name.

60.     Based on the statements provided by R.W. and K.M., the IP address data related to the accounts, the content of Chat messages, and the media files transferred between accounts, I believe it is probable that **KURREMULA** utilized the four Snapchat accounts previously listed in a criminal scheme to blackmail, or sextort, minor females and that he is doing so and/or has done so from the **SUBJECT PREMISES**.

20

61.     On January 2, 2024, a trash cover was conducted at the **SUBJECT PREMISES**. A review of the items in the trash can revealed numerous pieces of discarded mail. Many items listed **KURREMULA** as the intended recipient. It appeared that two adult females also received mail at the address, one of whom was listed as **KURREMULA**'s spouse on a healthcare claims document. One item of mail was addressed to an unknown individual with the first name "Sunny." The contents of the trash contained no evidence of any other adult male living in the residence other than **KURREMULA**.

62.     These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents as their premature disclosure may jeopardize this investigation.

## BACKGROUND ON DIGITAL MEDIA STORAGE DEVICES AND CHILD PORNOGRAPHY

63.     The ability of a computer (including smart devices) to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. Other digital media storage devices (e.g., compact disks, digital video disks, floppy disks, cell phones, Blackberries, iPhones, thumb drives, video gaming stations, etc.) can also store tremendous amounts of digital information, including digital video and picture files.

64.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g.,

21

traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data. Further, even if deleted, forensic examination can sometimes recover files and data, including deleted picture files.

65.    Computers and other digital file storage devices can store the equivalent of thousands of pages of digital information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires the searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site. Furthermore, I know that smart cell phones (a type of "computer," as broadly defined in 18 U.S.C. § 1030 (e)) can typically "synch" with a traditional desktop or laptop computer. The purpose of synching a smart phone to a traditional computer is to back up data that is stored on the phone so that it is not permanently lost if the portable smart phone is lost or damaged. Also, smart phone users may move files off the smart phone and onto a computer to free up storage space on the smart phone. Similarly, computer (e.g., desktop computers, smart phones, etc.) users may move files off of one computer and onto another computer or digital file storage device such as a thumb drive, a DVD, or an external hard drive, to free up space on the computer. For this reason, I am seeking authorization to seize all computers and digital file storage devices at the **SUBJECT PREMISES**—not solely any particular computer.

## SEARCHING COMPUTERS

66.     Searching computers for criminal evidence is a highly technical process requiring skill and a properly controlled environment.  The search of a computer or computer system is an exacting scientific procedure designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password-protected, or encrypted files.  Since computer evidence is vulnerable to tampering or destruction, the controlled atmosphere of a laboratory is essential to complete this task.  The FBI, Oklahoma City Division ("OCD"), has such a laboratory staffed with certified computer forensic examiners.  At least one certified forensic examiner will be on scene to assist with the proper collection of storage media found at the search location.  All magnetic storage media will be taken to the FBI OCD lab for analysis.  Identical copies of the original storage media will be produced by the assigned forensic examiner so as to maintain the integrity of the original evidence.  Due to the fact that child pornography is by its nature contraband, and illegal to possess, making an image of the computer's hard drive and other storage media on site is not a feasible alternative.

## VEHICLE INFOTAINMENT SYSTEMS

67.     Depending on the make, model, and year of manufacture, vehicles may have "Infotainment" systems which have the ability to store a vast amount of data, such as recent destinations, favorite locations, and the navigation history of where the vehicle has been.  This relevant data can be created by people inside the vehicle as well as unseen data files which are created and saved automatically by the vehicle.  These systems may also record events such as when and where the lights were turned on, which doors were opened and closed at specific locations, and where the vehicle was when Bluetooth or Wi-Fi connections were established.  Additionally, when the driver or passenger's cell phone is connected to the vehicle, data such as

23

call logs, contact lists, SMS messages, e-mails, pictures, videos, and social media feeds can also be saved to a vehicle's memory unit.

68.    This telematics information can be saved and remain stored within the vehicle's memory unit indefinitely, provided there has not been intervention which removes or overwrites the data—even information which has been deleted has the potential to be recovered. All this information and more can be harvested from the vehicle using forensic tools which limits the modification or deletion of the source.

## BIOMETRIC ACCESS TO DEVICES

69.    I request that this warrant permit law enforcement to compel the occupant(s) of the **SUBJECT PREMISES** to unlock any electronic devices requiring biometric access and are subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by

24

pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

      c.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

      d.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's content.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the content of a device.

f.    As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the electronic devices subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the electronic devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.    I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances, even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain amount of time.  For example, certain Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for eight hours and the passcode or password has not been entered in the last six days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from

26

other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.       Due to the foregoing, if law enforcement personnel encounter any electronic devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the occupants of the **SUBJECT PREMISES** to the fingerprint scanner of the electronic devices found at the **SUBJECT PREMISES**; (2) hold the devices found at the **SUBJECT PREMISES** in front of the faces of the occupants of the **SUBJET PREMISES** and activate the facial recognition feature; and/or (3) hold the devices found at the **SUBJECT PREMISES** in front of the faces of the occupants of the **SUBJECT PREMISES** and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to require that the occupants of the **SUBJECT PREMISES** state or otherwise provide the password for any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to require the occupants of the **SUIBJECT PREMISES** to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## AUTHORIZATION REQUEST

70.     Based on the above information, there is probable cause to believe that the foregoing laws have been violated, and that the following property, evidence, fruits, and instrumentalities of these offenses are located at the **SUBJECT PREMISES**.

71.     Based upon the foregoing, I respectfully request that this Court issue a search warrant for the **SUBJECT PREMISES**, described in Attachment A, authorizing the seizure of the items described in Attachment B to this Affidavit.

Respectfully submitted,

Shana M. Terry
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on January ___31___, 2024.

SHON T. ERWIN
United States Magistrate Judge
Western District of Oklahoma

28

## ATTACHMENT A

### Property to be Searched

15716 Potomac Drive, Edmond, Oklahoma 73013 is a single-family home with an attached two-car garage located on the east side of Potomac Drive. The front exterior of the house is comprised of light tan and brown bricks with dark tan paneling above the garage. A placard with the number "15716" is located on the brick wall to the left of the garage. The area to be searched includes the residence itself, as well as any outbuildings (including the attached garage), vehicles, and persons within the curtilage of the property.

A photograph of the **SUBJECT PREMISES** is pictured below.



## ATTACHMENT B

### Particular Things to be Seized

1. Computer(s), as broadly defined in 18 U.S.C. § 1030(e), other digital file storage devices, computer hardware, computer software, computer-related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: communicate with minors; visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or manufacture, distribute, possess, or receive child pornography, child erotica, or information pertaining to a sexual interest in children, specifically, for violations of 18 U.S.C. § 2242(b)—coercion and enticement of a minor, and which are reasonably believed by agents to contain such evidence.

2. Any and all computer software, including programs to run operating systems, applications (such as social media, word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

3. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and other electronic messages, and handwritten notes) pertaining to the coercion and enticement of a minor.

4. In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

5. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs or other electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C.

§ 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. 2256(2).

6. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs or other electronic messages, other digital data files or web cache information) concerning the receipt, transmission, manufacture, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2) or communication with minors.

7. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and other electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

8. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and other electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

9. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs, and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

10. Any and all cameras, film, videotapes, or other photographic equipment.

11. Any and all visual depictions of minors engaging in sexually explicit conduct.

31

12. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs, and electronic messages, and other digital data files), pertaining to the preparation, purchase, or acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8), or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

13. Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs or electronic messages, or other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

14. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

15. Any documents, records, or correspondence, in any format or medium (including, but not limited to, papers, notes, e-mail messages, chat messages, or other electronic data files), pertaining to location information, maps, addresses, or routes.

16. Any items which would corroborate the victims' accounts of abuse and/or identify the user of the media files maintained as evidence, including, but not limited to: condoms; drink containers; clothing items; fabric or other such material; and trace evidence, such as hairs or fibers.

17. International travel documents of **SAI KURREMULA**, including active passports.

18. Data from the Infotainment systems of vehicles located within the curtilage of the property described in Attachment A, specifically:

    a.  Data regarding Bluetooth wireless communications with other devices, contact lists, call logs, and digital messages;

    b.  Data from mass storage devices, to include unique identifiers and media files;

    c.  Data from the navigation system, to include location and routes;

    d.  System metadata;

    e.  Telematics data, including data which has been previously deleted but has not yet been overwritten.

19. If law enforcement personnel encounter any electronic devices that are subject to seizure pursuant to this warrant that may be unlocked using a biometric access feature, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of any occupant of the location described in Attachment A to the fingerprint scanner of the electronic devices; (2) hold the devices in front of the face of any occupant of the location described in Attachment A and activate the facial recognition feature; and/or (3) hold the devices in front of the face of any occupant of the location described in Attachment A and activate their iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.